AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the

Central District of California



LODGED
CLERK, U.S. DISTRICT COURT
5/11/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___JB___ DEPUTY

| United States of America | |
|---|---|
| v. | Case No.  2:23-mj-02417-DUTY |
| YUH PYNG JOU and JIMMY SU, | |
| Defendants. | |



FILED
CLERK, U.S. DISTRICT COURT
MAY 11 2023
CENTRAL DISTRICT OF CALIFORNIA
BY:_____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 10, 2023, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Engaging in the Business of Dealing Firearms Without a License |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Ani Ghaltakhchyan
Complainant's signature

Ani Ghaltakhchyan, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  5/11/2023

Judge's signature

City and state:  Los Angeles, California

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
Printed name and title

AUSA: Thomas Magaña (213-894-1344)

## I. AFFIDAVIT

I, Ani Ghaltakhchyan, being duly sworn, declare and state as follows:

## II. INTRODUCTION

1. I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since June 2021. I am currently assigned to the Glendale Field Office of the Los Angeles Field Division of ATF, which conducts investigations into violations of federal firearms, explosives, and narcotics laws. My experience as an ATF SA includes, but is not limited to, conducting physical surveillance, executing search and arrest warrants, and participating in controlled drug/gun purchases using informants. I have experience investigating violations of federal statues governing firearms and narcotics. I have also conducted surveillance of individuals trafficking firearms and illegal controlled substances, and persons possessing illegal firearms.

2. As part of my training, I attended the Criminal Investigator and Special Agent Basic Training Academies for ATF at the Federal Law Enforcement Training Center in Glynco, Georgia for approximately 27 weeks. This training included instructions on federal and state firearms and narcotics laws and regulations.

3. I graduated Magna Cum Laude with a Bachelor's Degree in Criminal Justice and Law in Society (Sociology) from California State University, Los Angeles. During my education, I completed a two-year internship with the United States Marshals

Services ("USMS") in Los Angeles, CA. During that two-year period, I spent six months at the USMS Fugitive Apprehension Task Force where I was trained to use databases such as the National Crime Information Center, to gather background information on the subjects of investigations.

### III. PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of a criminal complaint and arrest warrant against Yuh Pyng JOU ("JOU"), also known as "Debby," and JIMMY SU ("SU"), for violations of Title 18 U.S.C. § 922(a)(1)(A) (Engaging in the Business of Dealing Firearms Without a License).

5. This affidavit is also made in support of an application for a warrant to search the following:

   a. JOU's two adjacent interior offices within the Inheritor Cell Technology Longevity Clinic and Research Institute, a place of business controlled by JOU and located at 400 East Live Oak Ave, Arcadia, CA 91006 (the "Subject Premises"), as described more fully in Attachment A-1.

   b. A 2016 Ford Flex, license plate #7VJV107, registered to Hope Center[1] at 2491 Huntington Dr, San Marino, 91108, currently operated by SU (the "Subject Vehicle"), as described more fully in Attachment A-2.

   c. The persons of JOU and SU, as described more fully in Attachment A-3, and any digital devices found on their person.

---

[1] "Hope Center" is a purported charity founded by JOU. For further information, see https://hopecenter.community/outreached-detailed.

6.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (Engaging in the Business of Dealing Firearms Without a License); 18 U.S.C. § 1956 (a)(3)(B)(Sting Money Laundering); 21 U.S.C. § 841 (Distribution of or Possession with Intent to Distribute Controlled Substances) and 21 U.S.C. § 846 (Conspiracy) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, A-3 and B are incorporated herein by reference.

7.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## IV. SUMMARY OF PROBABLE CAUSE

8.  From November 2022 to April 2023, JOU laundered at least $660,000 in United States currency that she received in cash and believed to be the proceeds of narcotics trafficking. JOU would accept the cash from agents at the Subject Premises, launder the money through her business (ICT), and would deposit the funds into an undercover account held by IRS agents less her 8-10% fee. JOU also used the Subject Premises to sell one

3

kilogram of cocaine in transactions with undercover an undercover ATF agent.

9. Additionally, from January to April of 2023, JOU and SU illegally sold five firearms and a silencer to an undercover ATF agent at the Subject Premises, without holding the required licenses as firearms dealers, and despite the fact that SU is a convicted felon. JOU and SU would communicate with each other via phone, and JOU communicated with an undercover ATF Agent via phone call and text. SU is believed to have transported the firearms to the Subject Premises using the Subject Vehicle.

### V. STATEMENT OF PROBABLE CAUSE

10. Based on my review of ATF and IRS law enforcement reports of the incidents below, my review of audio and video recordings of these incidents, my conversations with law enforcement, and my personal involvement in the investigation, I know the following:

#### A. Background of Investigation, Identification of JOU, SU and the Subject Premises, and Initial Transactions

11. In May of 2022, IRS agents interviewed a confidential informant ("CI") in connection with an interdicted overseas shipment of 250 kilograms of methamphetamine.[2] The CI informed

---

[2] The CI was initially interviewed by Homeland Security Investigations following the above incident in September 2021 and has been cooperating with the IRS since May of 2022. The CI is presently being compensated by the IRS and ATF for their work and has not been charged in relation to the narcotics seizure. The information provided by the CI has been corroborated by law enforcement to the extent possible and the CI has been deemed reliable. The CI's role in this investigation has generally been limited to making introductions and setting up meetings for undercover agents. The CI was convicted in 2014 for use of a
*(footnote cont'd on next page)*

4

the IRS that he knew two individuals named Jimmy SU and Arthur SIMONDESCU ("SIMONDESCU") who sold narcotics, firearms, and ammunition.

12. IRS and ATF agents conducted a background check and determined that SU has a prior felony conviction for Assault with a Firearm from 1998. SIMONDESCU is JOU's minor son.

13. The CI also informed the IRS and ATF that JOU engages in money laundering for a fee. Accordingly, IRS Agent Drew Cienfuegos instructed the CI to schedule a meeting between JOU, an undercover ATF Agent ("UC1") and an undercover IRS Agent ("UC2") to discuss terms for a money laundering transaction, whereby the CI would inform JOU that he/she had friends who wanted to do business with JOU.

14. On November 16, 2022, UC1 and UC2 met with JOU in her interior offices at 400 East Live Oak Ave., Arcadia, CA 91006 (the "Subject Premises"). UC1 indicated that they were interested in purchasing drugs and laundering money and provided JOU with $20,000 in cash[3] in purported narcotics proceeds to launder. JOU agreed to launder the funds through her company Infinity Cell Technology ("ICT")[4] for a 10% fee, accepted the cash, and the following day transferred $18,000 to the UC's bank

---

false identification with intent to defraud, which resulted in a sentence of 1 year in jail and 3 years of probation. Additionally, the CI had their driver's license revoked following multiple DUI arrests.

[3] The Unless otherwise stated, the UCs always provided JOU funds in cash.

[4] This appears to be a distinct company from "Inheritor Cell Technology," which is the name that appears on the outside of the Subject Premises. Both are shortened to "ICT."

5

account, representing the return of the laundered funds minus JOU's 10% fee.

15. On December 5 and 6, 2022, UC1 again met with JOU at the Subject Premises after coordinating the meeting with her directly via phone text message. The UC's laundered another $20,000 in cash and purchased half a kilogram of cocaine for $8,000.[5]

16. On January 20, 2023, UC1 and UC2 met with JOU at the Subject Premises and gave JOU an additional $20,000 in cash to be laundered. Later that day, the CI called me and informed me that SU was at the Subject Premises with a firearm for sale. UC1 and UC2 returned to the Subject Premises, and UC1 observed SU leaving the parking lot in a 2016 Ford Flex bearing California license plate #7VJV107 (the "Subject Vehicle"). The UCs then purchased an un-serialized, privately manufactured pistol from JOU for $1,300.

17. From January 31 to February 28, 2023, the UCs engaged in two additional money-laundering transactions with JOU through the ICT account, for $100,000 and $250,000 respectively, accounting for a total of $350,000 in additional laundered funds. Both meetings were coordinated with JOU directly via phone call and text message[6] and took place at the Subject Premises.

---

[5] On February 27, 2023, a laboratory analysis confirmed the purchased substance contained cocaine.

[6] Unless otherwise noted, JOU set up all subsequent meetings via phone call and text message.

B. **February 28-April 25, 2023: JOU and SU Sold Undercover ATF Agents Five Firearms, Ammunition, and a Silencer; JOU Laundered $250,000 in Funds and Sold Another Half-Kilogram of Cocaine**

18. On February 27, 2023, the CI met with ATF agents and informed them that SIMONDESCU had a firearm that was potentially available. At the direction of the ATF, the CI asked JOU whether she would sell SIMONDESCU's firearm, and she agreed to sell it.

19. On February 28, 2023, UC1 met JOU at the Subject Premises to purchase the firearm. Upon arrival at the Subject Premises, JOU took UC1 up to her offices, put on a rubber glove, and retrieved a pistol with a magazine from her desk drawer. JOU told UC1 that the firearm belonged to SIMONDESCU, and that it used "special bullets." JOU then placed a phone call and spoke to an unknown individual, primarily in Chinese, but said in English, "Jimmy (SU) come to my room."

20. UC1 then heard a knock on the door, and SU walked into JOU's office holding a plastic gun box. SU opened the box, removed several boxes of ammunition, placed them on the desk, and described each to UC1 in detail. Ultimately, UC1 purchased one Smith & Wesson 9mm caliber pistol (model SW9VE), bearing serial number PBC4767, and four boxes of nine-millimeter ammunition from JOU and SU for $2,800.

21. Following this exchange, UC1 met with JOU individually on March 24 and April 5, 2023. During those meetings, UC1 purchased half a kilogram of cocaine from JOU and laundered an additional $250,000 through the ICT Account, respectively.

22. UC1 then met with JOU and SU together at the Subject Premises on April 10 and 25, 2023. On April 10, UC1 purchased three firearms from JOU and SU, which SU again brought into JOU's office, including one privately made un-serialized pistol, one .22 caliber Ruger pistol, and one .22 caliber Intratec pistol. On April 25, UC1 purchased a .45 caliber Llama Gabilondo y Cia pistol and a firearm silencer as defined by 18 U.S.C. § 921.

### C. Neither JOU nor SU Possesses a Federal Firearms License

23. On May 1, 2023, ATF Industry Operations Investigators conducted a query in ATF's Firearms Licensing System, which contains information on all federal firearm licensees who are licensed by the federal government to engage in manufacturing, distributing, and/or selling firearms. The examiner determined that neither JOU nor SU holds a federal firearms license to sell firearms.

24. Per my review of law enforcement databases, JOU and SU have no legally registered firearms. This includes silencers, which are defined as "firearms" under 26 U.S.C. § 5845.

## VI. THERE IS PROBABLE CAUSE THAT EVIDENCE OF THE SUBJECT OFFENSES WILL BE FOUND AT THE SUBJECT PREMISES

25. Each of the drug sales, gun sales, and money laundering transactions described above took place in JOU's offices at the Subject Premises.

26. Based on my knowledge of this investigation, JOU and SU transport drugs and firearms to the Subject Premises for sale and retain them there prior to transactions. I therefore believe

there is probable cause that drugs and firearms are routinely stored on the Subject Premises in anticipation of sales.

27. Additionally, based on my training and experience, drug and firearms traffickers often keep drugs and/or firearms in places where they have ready access and control, such as at their residences, places of business, vehicles, or in safes.

28. They also often keep other items related to their drug trafficking activities at their residences or places of business, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at such locations even if the trafficker shares the space with others who may be unaware of their criminal activity.

29. In my experience, individuals who engage in illicit sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

30. I also know that drug and firearms traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the transportation, ordering, sale, and distribution of illegal drugs and firearms. The

9

aforementioned records are often maintained where they have ready access to them, such as in their place of business and on their cell phones and other digital devices.

31. JOU also conducts money laundering transactions involving large amounts of cash at the Subject premises. Evidence of financial crimes often takes different forms, and includes bank records, accounting records, investment records, communications (e.g., with victims, coconspirators, and institutions), text messages, computer data, and multimedia, among other things. Evidence of financial crimes is often stored in hardcopy and digital format, including on cell phones, computers, tablets, external hard drives or USB drives, or remotely, e.g., in email, remote storage (e.g., cloud), and social media accounts.

32. Drug and firearms traffickers and financial criminals often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing businesses, which frequently operate on a cash basis, as in this case. Such currency is often stored in their residences and places of business and in safes.

33. The is therefore probable cause to believe that evidence of drug and firearm sales and money laundering transactions will be found at the Subject Premises and on the digital devices located therein.

## VII. THERE IS PROBABLE CAUSE TO BELIEVE THAT EVIDENCE OF THE SUBJECT OFFENSES WILL BE FOUND IN THE SUBJECT VEHICLE

34. On January 20, the CI informed UC1 that SU had brought a firearm for purchase to the Subject Premises. SU drove to the Subject Premises in the Subject Vehicle, and UC1 saw SU departing in the Subject Vehicle at the time UC1 arrived. Based on that exchange, and the fact that SU also brought the firearms into JOU's office at two subsequent firearm sales, I believe SU also used the Subject Vehicle to transport the firearms that UC1 purchased on February 28 and April 10 to the Subject Premises.

35. This is consistent with my training and experience that individuals engaged in the illegal purchase and sale of firearms often use their vehicles to store and transport for sale firearms, ammunition, and magazines, as well as to store and transport the large quantities of cash that are the proceeds of their business.

36. Additionally, individuals engaging in firearms trafficking frequently use their cellular phones and digital devices in doing so, as described in the section immediately above. Such devices are frequently transported and stored in their vehicles.

37. There is therefore probable cause to believe that evidence of illegal sales of firearms will be found in the Subject Vehicle and in any digital devices located therein.

## VIII. THERE IS PROBABLE CAUSE TO BELIEVE THAT EVIDENCE OF THE SUBJECT OFFENSES WILL BE FOUND ON JOU AND SU, INCLUDING ON ANY DIGITAL DEVICE FOUND ON THEIR PERSONS

38. Following UC1's first meeting with JOU on November 16, 2022, UC1 routinely communicated directly with JOU via text message to set up meetings for money laundering transactions, and drug and firearm sales. Additionally, on February 28 and in subsequent firearms sales, UC1 saw JOU call SU from her office on the phone and direct him to carry in the firearms and ammunition that UC1 then purchased. Based on these observations, and my training and experience regarding use of digital devices in drug trafficking, firearms trafficking, and money laundering, as described in paragraph VI, there is probable cause to believe that evidence of the Subject Offenses will be found on JOU and SU's persons, including on cell phones and other digital devices which they may be carrying.

## IX. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[7]

39. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[7] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

13

who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    40.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

        b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

41. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress JOU and/or SU's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of JOU and/or SU's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## X. CONCLUSION

  42. For all of the reasons described above, there is probable cause to believe that JOU and SU have committed a violation of 18 U.S.C. § 922(a)(1)(A): Dealing in Firearms Without a License. There is also probable cause that the items to be seized described in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found in a search of the Subject Premises, the Subject Vehicle, and on JOU and SU's person as described in Attachments A-1, A-2, and A-3.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 11th day of May,
2023.

_____
HON. JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE